[No. 29942. Department One. November 7, 1946.]

OSCAR A. KARLSON, *Appellant,* v. THE DEPARTMENT OF LABOR AND INDUSTRIES, *Respondent.*[1]

[1]Reported in 173 P. (2d) 1001.

*Griffin & Gershon* and *Russell F. Stark,* for appellant.

*The Attorney General, Phil H. Gallagher* and *Russell M. Lindel, Assistants,* for respondent.

JEFFERS, J.—On July 6, 1940, Oscar Karlson, who was employed by Consolidated Builders, Inc., in the construction of the Grand Coulee dam, accidentally fell about sixty-five feet into the Columbia river. The fall was apparently caused by a brace giving way, allowing Mr. Karlson to fall backwards. In his fall he struck a scaffold.

A claim was duly filed with the department of labor and industries, and on August 2, 1940, the claim was allowed and closed for medical treatment, but the order provided that no time loss compensation be paid or permanent partial disability award be made. The claim was reopened on August 19, 1940, effective as of July 26, 1940, for treatment and time loss, and was again closed on October 28, 1940.

Claimant petitioned the joint board for a rehearing, which was granted on December 13, 1940. Under an agreement entered into between claimant and the department, the matter was submitted to an arbitration commission consisting

of Drs. Joe Brugman, Ernest A. Rickards, and Ira O. Mc-Lemore. On January 21, 1941, the commission examined claimant and filed its unanimous report covering such examination. It appears in the report that at that time claimant complained of pain in the lower back; that the pain would begin in the lower portion of the spine and extend up the spine and cause headaches; that this did not occur every day; that in the last month the ache had extended out in the right arm; that the back ached more on walking or working. At this time the doctors made a thorough examination. X rays were taken, and the report indicates what the X rays revealed. The report concludes:

"This claimant was referred to an ear specialist for a definite check on the condition of his left ear and his report will be omitted.

"It is the opinion of this commission that his condition is not fixed and further treatment is indicated. Due to the evidence of new bone formation around the facets between the 5th lumbar and the sacrum we are of the opinion that he suffered a very definite injury to these facets.

"Therefore we would recommend that he have the benfit of a fusion operation of the lumbosacral joint."

Claimant did not see fit to submit to the suggested operation, and the matter was again referred to the commission, which again examined him on June 10, 1941, and again submitted a unanimous report, which shows that at this time claimant was complaining of pain in the lower back. The report concludes:

"This man's condition has improved some since the last examination. The bursitis in the right shoulder has developed since this commission's examination of January 21, 1941 and is not connected with the injury of July 6, 1940. His hearing was not tested by this commission but he was referred to Dr. Goss.

"His condition can be considered as fixed and no further treatment is indicated.

"We recommend a P.P.D. award of 20% of the maximum for unspecified disabilities or 16 degrees."

On July 22, 1941, the claim was again closed, with a permanent partial disability based on the findings of the doctors.

On June 18, 1943, claimant again made application to reopen his claim. In answer to the following question on the application blank: "In what manner has your condition become worse since your claim was closed?" claimant made the following statement:

"I attended bar in a tavern for a period of about eleven months, but I was required to handle cases of beer, and the work required more or less lifting and after handling a few cases of beer, it was almost impossible for me to stand on my feet due to the condition of the small of my back, from the lifting.

"My right arm has given me more or less severe pain and the nerves in the hand have been greatly affected and in handling glasses at the bar on several occasions, the glass slipped out of my hand and the contents spilled, and it happened so often, I was obliged to quit as I could not handle my work in the manner that I should have, due to the nerves in my arm. I have been exceedingly nervous and the pain is increasing right along.

"I worked tending bar about eleven months and earning on an average of $32.50 per week.

"On the last day of September, 1942, I was hired as a guard in the Coast Guard and make approximately $49.00 per week."

Claimant was again referred to Drs. Joe Brugman and I. O. McLemore for an examination on the question of aggravation. An examination was made on July 19, 1943, and the conclusions of the doctors, as shown by their report, were as follows:

"This commission is still of the opinion as expressed in our report of examination of June 10, 1941, that his condition in the right shoulder and arm are not connected with his injury of July 6, 1940.

"His back condition shows no aggravation, in fact might be considered a little improved. Therefore it is this commission's opinion that there is no aggravation and recommend that his claim remain closed."

*On July 28, 1943, the application to reopen was denied,* for the reason that no aggravation was shown. No appeal was taken to the joint board from this order of the supervisor.

On August 14, 1944, another application to reopen the claim was filed. The application states the reason for reopening is "severe pain between shoulders, running into right shoulder and down right arm, with right arm numb." The application further states that claim was closed on July 22, 1941. No mention is made of closing date of July 28, 1943.

The claim was again referred to Drs. Brugman and Mc-Lemore, who examined claimant on September 20, 1944. The conclusions of the doctors after this examination were:

"This man's complaints are all of the right upper extremity and shoulder and is of an arthritic nature. As stated before we do not believe this is related to the injury therefore would recommend that his claim remain closed."

On September 29, 1944, an order was entered stating that there was no aggravation and directing that the claim remain closed in accordance with the order of July 22, 1941.

An application for rehearing before the joint board was made, in which claimant stated:

"That since the closing of his claim [no closing date mentioned] his condition has steadily grown worse and has become aggravated in that specially he has developed severe pain between the shoulders, which runs into his right shoulder and down his right arm and that his right arm becomes numb."

This application was granted, and a hearing was had before an examiner, beginning on November 9, 1944, and concluding, after certain continuances, on March 14, 1945. At these several hearings, the following witnesses were sworn and testified: claimant, Dr. E. A. Rickards, Dr. Joe Brugman, and Dr. I. O. McLemore. Claimant's exhibit No. 1, report of medical examination dated January 21, 1941, was admitted in evidence; also the department's exhibit A, report of medical examination dated June 10, 1941.

On March 26, 1945, the joint board entered its order sustaining the order of the supervisor dated September 29, 1944. An appeal was taken by claimant from the order of the joint board to the superior court for King county, where

the cause came on for hearing before the court and jury on September 17, 1945.

At this hearing, Mr. Griffin read the transcribed testimony of Dr. Rickards and claimant. We shall set out the substance of some of Dr. Rickards' testimony, and some of it we shall quote.

After the doctor was qualified, the following questions were asked:

"Q. Doctor, you first examined the claimant in this case, Oscar A. Karlson, in an arbitration examination on or about January 21, 1941? A. I did. Q. And at that time, according to the records, you recommended that he have a fusion operation of the lumbo-sacral joint? A. Yes. Q. . . . At that examination, doctor, he gave you a history of his injury and of his work record, complaints and so forth?"

At this point plaintiff's exhibit No. 1, report of arbitration commission dated January 21, 1941, hereinbefore referred to, was introduced in evidence.

"Q. It was your understanding doctor, that he turned down that operation and received some conservative treatment thereafter. A. Yes. I understand that. Q. Then you examined him again in another arbitration examination on June 10, 1941, did you doctor? A. Yes. Q. And at that time again he related the history and complaints and you made an examination? A. Yes. Q. And then the claim was closed, doctor, on or about July 22, 1941 and then the record shows, doctor, that he applied to reopen his claim on or about— well, the application was received by the department on September 5, 1944, but on the application blank it appears that you examined him again on August 15, 1944. A. Yes, sir. Q. And doctor, when you examined him again August 15, 1944, will you state what intervening history he gave you between the time you last saw him in 1941? A. He complained of more pain and stiffness of his shoulder and of his back, especially in his right hip and right leg, the pain going down and stiffness going down his right hip and leg and numbness of the right hip and leg. Q. In 1941 doctor, had he complained of his right leg? A. I don't believe so, I can't recall, but to my knowledge he didn't complain of his right leg at that time. He complained of the hip at the lower spine. Q. And when you examined him on August 15, 1944, doctor, will you state generally whether there was any change in his condition over what he was when you last saw

him in 1941? A. There seemed to be more stiffness of the right shoulder and the pain was worse than it was the last time I examined him. He complained of more pain. Q. Complained of more pain where? A. In the shoulder and up through—between the shoulders. He complained of pain down the spine in the lumbar region and he complained of considerable pain through the hip and down the leg.

"Mr. Cummins: Which leg? The Witness: The right leg, pardon me.

"Q. And doctor, how did you account for his complaints about his right leg when you examined him on August 15, 1944? A. I believe the condition was an impingement on the nerves supplying the leg. Q. Where was the impingement taking place? A. It was taking place in the lower lumbar region. Q. That is the low back region? A. Yes, lower spine. Q. The roots of the leg nerves are located in the low back? A. They come out through the spine—the lower part. Q. When there is pressure on the nerve roots what sensation does the patient feel, doctor? A. Well, it depends whether it is the sensory or motor nerves. If it is the sensory nerves there is more pain, if it is the motor nerves, there is some impairment of the use of the leg.

"Mr. Cummins: What was it in this case? The Witness: He was complaining of pain down the leg. Mr. Cummins: The right leg? The Witness: Numbness of the right leg and he complained his foot would drag at times when he was walking.

"Q. Doctor, what was your opinion, on August 15, 1944, when you examined him, with reference to whether or not there had been any aggravation since you last saw him in July—I mean, in 1941. A. His complaint of his hip and leg, that had not shown up previously, not to the condition it is in at the present time. Q. Therefore, what was your opinion as to whether' or not there had been any aggravation in his condition when you examined him August 15, 1944? A. I think the condition is the result of the accident. Q. What was your opinion, doctor, as to whether or not there was any aggravation between the closing in '41 and the time he applied for reopening? A. No doubt there was an aggravation there of the hip. Q. And what was your opinion with respect to the aggravation in the upper back and right shoulder and arm? A. More pain, more distress, more stiffness than at the time of the last examination. Q. And doctor, what was your recommendation, what did you

recommend on August 15, and what is your recommendation now? A. I recommended the short-wave diathermy treatments and serum injections. Q. Is that still your recommendation? A. Yes, I put him under treatment at that time and have been treating him ever since. His right shoulder is improved and his back has improved, that is, the upper part of his back, the lower part, the spine hasn't improved and the leg hasn't improved. Q. What is the nature of the treatment you have administered? A. Short-wave diathermy and serum injections. Q. How often have you seen him since that time, approximately? A. Approximately weekly. Q. When is the last time you saw him, doctor? A. Let's see, about the 7th—6th or 7th of November. Q. Doctor, what is your opinion as to the cause of the condition for which you have been treating him and of which he has been complaining? A. I think it is a condition of the original—the result of the original accident."

On cross-examination, Dr. Rickards was handed the department's exhibit A, which is the report of the arbitration commission made on June 10, 1941. After the doctor had identified this report, it was offered in evidence. The doctor admitted that the history contained in the two reports was obtained from claimant personally at the time of the examination.

Plaintiff was next called as a witness in his own behalf, and, after describing his work at Grand Coulee dam and the accident, he was asked the following questions:

"Q. And subsequently you have several examinations with different doctors? A. Yes sir. Q. And at one time they wanted to operate on your back? A. Yes sir. Q. And you refused this operation? A. Yes sir. Q. And instead they gave you conservative treatment? A. Yes sir. Q. That was what? A. Shots and diathermy and exercise of a certain kind. Q. And then on July 22, 1941 the department closed your claim and paid you a permanent partial disability award of—

"Mr. Cummins: 20% for the back and a flat $150 settlement for loss of hearing. That was $630 all together for permanent partial disability.

"Q. Is that right? A. Yes. . . . Q. Mr. Karlson, you then applied to re-open your claim in 1944. The application was received by the department September 5, 1944, will you tell us why you applied to reopen your claim? A. Well,

I was getting pains. The 5th of July I was sitting up at the Eagles and all at once I got just like someone come and knocked me off the chair. So my friends pick me up and took me up to the Mason hospital, but they won't do anything for me that night. I was under great pain in my right shoulder and right through my chest, so I went home, or they took me home, rather, and I put on some hot treatment and one of their doctors up at the hospital told me to take aspirin and come back the next day and the next day the doctor treated me up there, looked me over and he gave me some kind of a pills to take and I went home and it never helped and I kept on with the hot treatments of my own, and I was getting worser and worser and finally I had to go to the doctor and I went to Dr. Rickards. Q. And you saw him August 15, 1944? A. Yes. Q. How would you compare your condition of September 5, 1944 with what it was July 21, 1941? A. Well, that is difficult to explain. Q. I mean, were you better or worse? A. I was a whole lot worse. I couldn't hardly use my right arm after this attack and it was a great big pain all over my right shoulder. Q. What other troubles did you have on September 5, 1944? A. September 5, 1944?

"MR. CUMMINS: What other besides your right arm and shoulder? THE WITNESS: Well, there was pains in my whole back and down my right leg.

"Q. Did you ever have any trouble in your right leg on July 22, 1941? A. Yes, I have. Q. When did the trouble in the right leg start? A. After the fall. Q. And at the time of the settlement of July 22, 1941 how did your condition of your back and your right leg compare with your back and right leg on September 5, 1944? A. Well, the condition of my back and my right shoulder then was in good condition. I could walk and move around freely, no pain whatsoever, but now, I am in pain and I can't lift my right arm very high or take hold with my right hand and my right leg after being up out of bed for oh, sometimes 2 or 3 hours and sometimes 5 or 6 hours, my right toes start to drag. Q. Did you have any drag in your leg July 22, 1941? A. I did not have the drag of my toe, but it was pain, but no drag. Q. No drag in 1941? A. No, never have, I could go to a dance floor and dance. Q. Since August 15, 1944, have you taken any treatment? A. Yes, I have. Q. Who with? A. Dr. Rickards. Q. How often? A. I saw him twice a week and lately I only see him about once a week. Q. What kind of treatment is the doctor giving you? A. What you call short-wave diathermy and shots. Q. Have you ever been able to

do carpenter work since the accident? A. No I haven't. Q. Are you able to do any heavy work continuously now? A. No. Q. Before this accident on July 6, 1940 what was your physical condition? A. A-1. Q. Were you suffering from any of the troubles you described here today? A. No, never have been up to that day."

On cross-examination, plaintiff testified that he had worked as a bartender for approximately eleven months; that he had to quit that job because he would lose the grip in his right hand and drop the glasses; that he then went to work for the coast guard, where he worked for approximately two years, or up to about September 26, 1944, since which time he had been operating a little secondhand store.

At this point plaintiff rested, and counsel for the department moved for a dismissal, upon the ground that the claim for aggravation was based entirely upon subjective symptoms. After argument, the trial court denied the motion. Counsel for the department then proceeded to read from the testimony of Dr. Joe Brugman, called as a witness for defendant. After being qualified, the doctor was asked the following questions:

"Q. Doctor, I understand, and the file so reflects, that you saw and examined this claimant on four different occasions, starting the first examination January 21, 1941, was it not? A. Yes. Q. And the second June 10, 1941? A. Yes and July 19, 1943 and September 20, 1944. Q. And Dr. Ira O. McLemore made all four of these examinations with you too, did he not? A. Yes. Q. And Dr. E. A. Rickards was on the commission and saw and examined him on the first two examinations of January 21, 1941 and the second on June 10, 1941? A. Yes. Q. I am now showing you what has been marked department's exhibit A, report of medical examination made by Dr. I. O. McLemore, Dr. E. A. Rickards and yourself, dated June 10, 1941, and is that your signature Dr. Brugman?

"Mr. Gershon: June 10th or January 21st? Mr. Cummins: I am talking about June 10th.

"(continuing) Is that the report you made to the department of your medical examination of that date? A. Yes. [Objection made by Mr. Gershon to last question.] Q. What original history of injury did he give you, doctor, at the time of the first examination January 21, 1941?"

In answer to the above question, the doctor related the history as given to him, and as appears in claimant's exhibit No. 1, hereinbefore referred to.

"Q. What was he complaining about at that time in his back? A. His back pained him and he pointed to the lower lumbo-sacral region. Q. That is the low back? A. Yes. He stated the pain or ache begins in the lower portion of the spine and at times extends up the spine and gives him a headache. This does not occur every day. In the last month the ache extends out in the right arm when the back aches. The back ached on walking or working. He worked 3 days as a bar tender and was unable to put in a full shift. He had not received any treatment for the back or for the ear condition since he left the hospital. He stated he used the hot pad at home occasionally for the back discomfort. Right ear, and dizziness has improved some since the accident, but it still feels like a waterfall. This sensation of water falling comes on most any time of the day or night. He is unable to hear as well in the right ear as the left. Q. I take it you gave him a general physical examination at that time and also had x-ray films made of his low back where he was complaining, doctor? A. Yes. Q. And what did you recommend at that time, doctor? A. We recommended that his back condition was not fixed and that he needed further treatment. Q. Now, the next time you saw him on June 10, 1941 what interim history did he give you, what had he been doing and what treatment had he received between the two examinations? A. He stated that in that time he had had a course of treatments consisting of hypodermic injections and electrical treatments. He developed a condition of loss of power in the right hand and the electrical treatments were for that condition and it had practically cleared up. He had not returned to work and thinks his back is about the same as it was at the previous examination. Q. What were his complaints on that occasion? A. Pain in the lower back. Q. What did you conclude as a result of this examination, about his back condition? A. We thought his back condition had improved some since the last examination. The condition in the right shoulder had developed in the meantime, but we did not feel this was connected with the injury of July 6, 1940 and we considered his condition as fixed and no further treatment was indicated and we recommended a P.P.D. award of 20% of the maximum for unspecified disability.

"Q. Then you next saw him on July 19, 1943, and examined him, doctor? A. Yes. Q. What history did he give you then as to what he had been doing? A. He stated that in September, 1941 he started tending bar but after 11 months had to quit because of his back and right arm and he stated he would get spells in his right arm about once a week and could not hold the glasses. In the summer of 1942 he got a job as a guard and is still doing that. Q. What complaints did he make at that time? A. Continuous ache in the back. If he walks too much or sits too long the back aches more severely. He gets nervous spells and the right hand shakes all the time. Q. What were your conclusions after that examination, doctor? A. We considered that his condition of the right arm was not connected with his injury of July 6, 1940. His back showed no aggravation, in fact, might be considered a little improved. We recommended that his claim remain closed. Q. Then the last time you saw and examined him with Dr. McLemore was on September 20, 1944? A. Yes. Q. What history did he give you then? A. He stated that since July 5, 1944 he had not worked steadily because of the ache in his back and right arm kept him from sleep. He had been receiving short wave treatments and shots and he thinks this has helped. Weather does not seem to affect the trouble. Coughing causes a tearing pain in the right shoulder. The right leg had begun to drag in the past 3 weeks. Occasionally the pain in the back goes down the right leg. . . . Q. What were your conclusions as a result of the last time? A. His complaints at that time were all of the right upper extremity and shoulder and we considered them of an arthritic nature. Q. That is the right arm? A. Yes, and as we had previously stated before, we did not believe this condition was connected with the injury and recommended that the claim remain closed."

On cross-examination, the witness testified in part as follows:

"Q. Doctor, in complaining to you of the right arm he stated that the pain started in the back and went up to the spine through the shoulder and arm did he not? A. The last time we examined him, yes. Q. Well, I will ask you doctor, whether or not on July 10, 1941 the second time you examined him, whether or not his complaints were as follows —A. I didn't examine him July 10, 1941. . . . Q. Doctor, the first time that you saw this man was January 21, 1941? A. Yes. Q. And at that time did he not complain to you as

follows: 'In the last month the ache extends out in the right arm when the back aches.' Is that correct, doctor? A. No, not at that time. Q. Well, calling your attention to claimant's exhibit 1, which is your examination of January 21, 1941, I will direct you to paragraph 2, line 6. A. Oh, yes, that is in there. Q. So, doctor, every time he complained about his arm, starting from the first time you saw him and examined him he told you about the pain in his arm emanating and starting from the back, did he not? A. Yes. Q. All of your examinations were at the request of the department of labor and industries? A. Yes. Q. And the first two times Dr. Ernest A. Rickards and Dr. McLemore were on the commission and the last two times Dr. McLemore and yourself constituted the commission? A. Yes.

"Q. Did he tell you who he had been receiving treatment from, doctor? A. He may have, but I have forgotten. Q. Do you know the nature of the treatment he was receiving? A. He stated he was receiving shots and short wave. Q. Did you understand the treatment to be so-called anti-arthritic treatment? A. Yes. Q. Does he suffer from arthritis, doctor? A. Yes. Q. Is it the type of arthritis that is generally considered progressive? . . . A. All types of arthritis are progressive. Any disease can be progressive. Q. Did you take any new x-rays on either of the last 2 examinations? A. No. Q. And what were the x-ray— your x-ray interpretations, doctor? A. That he had some injury to the facets of the 5th lumbar vertebrae with some new bone formation around the facets. Q. And that new bone formation is arthritis? A. It may be or may be indicative of injury. Q. Of fracture? A. Not necessarily fracture, but in the joint and the injury there may have caused irritation of the bone which caused new bone formation.

"Q. Now, doctor, when you examined him June 10, 1941 just before the claim was closed, he was able to bend his back forward and touch the finger tips down to the floor— touch the floor with his finger tips with his knees stiff, was he not? A. Yes. Q. And when you examined him on July 19, 1943 after he applied to reopen his case he was only able to bring his finger tips within 4″ of the floor with recovery, was he not? A. I didn't state he was able to do it, I said he did it. That is that the record shows that he bent forward and brought his finger tips 4″ from the floor, whether he was able to go further or not we didn't state. Q. With slow recovery? A. Yes. Q. You also found July 19, 1943 after he had applied to reopen right and left rotation were slightly restricted, did you not? A. Yes. Q. Whereas

at the time the claim was closed June 10, 1941 you found rotation was good, did you not, doctor? A. Yes, but he complained of pain on doing it. Q. At no time, doctor, did you examine this man to treat him? . . . A. No.

"Q. Now, did you state, doctor, that all of his complaints of September 20, 1944 were limited to the right shoulder? . . . A. Yes. Q. In your report to the department, doctor, what were his complaints, doctor? . . . Q. As a matter of fact, doctor, in the report submitted to the department of labor and industries didn't you state that he complained to you as follows: 'Pain in the back from about the 6th dorsal vertebra to the 2nd lumbar vertebra to the right of the spine. This pain goes out to the right shoulder. At times this pain goes down the entire spine and into the right leg.' . . . A. Yes. Q. When his claim was closed June 10, 1941, doctor, there was no complaint of the right leg was there? A. No, he didn't state anything about the right leg. Q. And straight leg raising at that time was carried out to 80 degrees on both sides? A. Yes. Q. Whereas, the last time you examined him the straight leg raising was executed to 75 degrees on the right side and 80 degrees on the left side. A. Well, let me tell you, we don't use any instrument for measuring that distance and we estimate it and you can easily be off even 10 degrees on that. Anywhere around from 70 to 90 degrees we consider normal and so we don't feel it necessary to measure the exact motion there. Q. At any rate, in your report to the department of June 10, 1941 you reported straight leg raising was executed to 80 degrees on each side, whereas the last time you examined him you reported it was executed to 75 degrees on the right and 80 on the left. A. That is what we reported. If we had had the other examinations in front of us we would have probably put down the same. Q. Doctor, did you inquire from him whether he had ever suffered from rheumatism, or arthritis and pains and aches in the right shoulder, back and right leg before the accident? A. Yes. Q. What did he tell you? A. No. Q. And medical science does recognize, does it not, doctor, that arthritis is lighted up by trauma. A. Yes. . . .

"Q. Did you get a history as to what part of his body struck the scaffold, doctor? A. I don't think he stated what part, because generally in these cases where there is a fall they don't know what part of the body they do hit. Q. Doctor, the pain in the right leg and the dragging of the right leg could be explained through a diagnosis of arthritis causing pressure on the nerve roots of the sciatic nerve could it

not? . . . A. If the diagnosis of arthritis was made in the spine, yes. Q. You did diagnose arthritis in the spine, did you not, doctor? A. I don't think we did. We didn't even mention arthritis in the 5th lumbar vertebra where he had trouble in the lower back. Q. Well, the only time you mentioned the interpretation of the x-rays was on your first examination January 21, 1941, doctor, is that correct? A. Yes. Q. And at that time, doctor, the x-rays showed new bone formation along the articular facets of both sides between the 5th lumbar and the sacrum? A. Yes. Q. And very slight spur formation on the anterior and superior angle of the 2nd lumbar vertebrae? A. Yes. Q. And spur formation is generally considered arthritis? . . . Q. This spur formation was arthritis was it not? A. Probably. Q. New bone formation was probably arthritis? A. I won't say it was. Q. Are you prepared to say whether it was not? A. No, I am not."

Dr. I. O. McLemore was also called by the department, and the questions propounded to him were practically the same as those propounded to Dr. Brugman, and the answers given were in effect the same as the answers given by Dr. Brugman.

The case was submitted to the jury upon the following issue, as appears from instruction No. 1:

"The only issue to be decided by you in this case is whether the claimant suffered an aggravation of his condition between the denial of his first petition to reopen his claim, to-wit, July 28, 1943, and September 5, 1944, when he again applied to reopen his claim."

While the trial court, in its statement of the case as contained in instruction No. 1, referred to certain parts of the departmental record, it specifically stated in instruction No. 2:

"The foregoing statement is not evidence and is just a brief statement of the contentions of the plaintiff, Oscar A. Karlson, and the defendant, department of labor and industries, the details of which you have heard from the transcript, and the witnesses who have testified for and on behalf of the plaintiff and the defendant."

The trial court also, as a part of instruction No. 19, stated:

"Your verdict in this case will be in the form of an answer to the following interrogatory:

"INTERROGATORY:

"Has the plaintiff, since July 28, 1943, suffered an aggravation or increase of disability due to his injury?

"Your answer must be 'yes' or 'no.' "

While it is apparent that the testimony of the doctors covered a wide range, nevertheless, under the court's instruction, the question of aggravation was limited to the period between July 28, 1943, and September 5, 1944.

No error is based upon any instruction given by the court, and the instructions became the law of the case. No error is claimed because of the admission of any testimony or exhibit.

The jury, in answer to the interrogatory hereinbefore referred to, answered "Yes." The department filed a motion for judgment notwithstanding the verdict, or in the alternative for a new trial. The trial court, on January 4, 1946, entered its judgment granting the department's motion for judgment n. o. v. and, in the event of a reversal thereof, granting the department's motion for new trial. Claimant has appealed to this court from the judgment entered.

Appellant has set out no assignments of error in his brief; however, respondent raises no question in regard to such failure on this appeal.

Appellant states the question involved is: Was the evidence sufficient to support the jury's affirmative answer to the interrogatory, "Should the plaintiff's claim be reopened?"

We are at a loss to understand where in the record appellant found the purported interrogatory above quoted, as, according to the record before us, it certainly was not the one submitted to the jury.

Respondent department states there are two questions involved: (1) Is there substantial evidence of aggravation between the dates of July 28, 1943 (date of supervisor's order) and September 5, 1944 (date of receipt of claimant's application to reopen)? (2) When the joint board grants a rehearing to a claimant on the ground of aggravation, may it pass upon any matter related to the injury, or is its jurisdiction limited to the matter of aggravation of

claimant's condition subsequent to a final adjudication by the supervisor from which no appeal has been taken within the statutory period?

██ In considering the evidence for the purpose of passing upon the motion for judgment n. o. v., we recognize the rule that such a judgment will be granted only when the court can say, as a matter of law, that there is neither evidence nor reasonable inference from evidence sufficient to sustain the verdict. *Stevich v. Department of Labor & Industries*, 182 Wash. 401, 47 P. (2d) 32.

██ In *Darling v. Department of Labor & Industries*, 6 Wn. (2d) 651, 108 P. (2d) 1034, it is stated that, since chapter 184, Laws of 1939, p. 579, Rem. Rev. Stat. (Sup.), § 7697-2 [P.P.C. § 704-3], became effective, a verdict in such cases as this has the same force and effect as a verdict in actions at law. We further stated that such a verdict must stand if there is any substantial evidence, as distinguished from a mere scintilla of evidence, to support it.

 We will first refer to the case of *Larson v. Department of Labor & Industries*, 24 Wn. (2d) 461, 166 P. (2d) 159, wherein some of the rules relative to a claim for aggravation are announced:

"We start with the proposition that the burden of proof is upon the party attacking the decision of the joint board. *Reid v. Department of Labor & Industries*, 1 Wn. (2d) 430, 437, 96 P. (2d) 492. In that case, we stated:

" 'It is a condition prerequisite to the reopening of a claim for additional compensation by reason of aggravation of *disability* that there be a determination as to the disability and the rate of compensation to be awarded therefor, and the further condition *that there be a change in the claimant's condition since that determination.*' (Italics ours.)

"In *State ex rel. Stone v. Olinger*, 6 Wn. (2d) 643, 647, 108 P. (2d) 630, we stated:

" 'In considering cases of "aggravation," following a classification of "permanent partial disability," this court has always proceeded upon the principle that "aggravation," as that term is used in Rem. Rev. Stat., § 7679 [P.C. § 3472] (h), has reference to an *increase of disability* occurring *after* a claim has been closed. . . .

" 'There can be no proper award for "aggravation" of a permanent partial disability unless it appears (1) that the

condition of the injured workman has previously been determined to have reached a fixed state, (2) that a rate of compensation was established for such disability, (3) that the claim was closed on that basis, and (4) that an *increase of disability* has been found to have occurred *after the date of such closing.'* (Italics ours.)"

There is no question but that the condition of appellant, as it was found by the arbitration commission consisting of the three doctors hereinbefore mentioned to be on January 21, 1941, and June 10, 1941, had become fixed on June 10, 1941; that a rate of compensation was established for the disability determined to have resulted from the injury of July 6, 1940; and that the claim was closed by order of the joint board on July 22, 1941, based upon the report and findings of the commission.

There can be no question but that, in the doctors' examination made on June 10, 1941, they considered appellant's claim relative to his back, right shoulder, arm, and hand, and concluded that the condition of the three members last mentioned was not connected with the original injury, and that the back condition had become fixed.

Appellant apparently accepted the award made by the joint board under its order of July 22, 1941, and no appeal was taken from that order. However, appellant made application to reopen his claim, on the ground of aggravation, and, after his application had been referred to Drs. Brugman and McLemore, and those doctors had again examined him and had made their report and findings to the effect that no aggravation was shown, the supervisor, on July 28, 1943, entered an order denying the application to reopen, on the ground that no aggravation was shown since the closing order of July 22, 1941. No appeal to the joint board was taken from this order of the supervisor.

Another application to reopen for aggravation was filed on August 14, 1944. The applicant, in answer to the following question: "In what manner has your condition become worse since your claim was closed?" stated: "Severe pain between shoulders, running into right shoulder and down right arm, with right arm numb."

This last application was denied by the supervisor on September 29, 1944. An application for rehearing before the joint board was made, based upon the same grounds as the application to the supervisor. This application for rehearing was granted, as hereinbefore set out, and the hearing held, as herein indicated.

This case was tried prior to our decision in *Hutchings v. Department of Labor & Industries,* 24 Wn. (2d) 711, 167 P. (2d) 444, wherein we announced the rule to be followed in regard to all or parts of the supervisor's record.

In the instant case, as in many others, the entire supervisor's record was certified and apparently referred to by the court and all parties without objection. In view of the references to the supervisor's record made in the briefs of the respective parties, and in view of the scope of the examination of the doctors who testified, which examination was not limited to the time between July 28, 1943, when the claim was closed for the reason no aggravation was shown, and the time of the application to reopen, we are again convinced of the salutary effect of the rule announced in the case last referred to.

However, in this case we must accept and be governed by the record which was properly before the trial court and which is before us on this appeal.

■ On the question of whether or not the trial court properly granted the motion of the department for judgment n. o. v., we adopt as our conclusion, in part, the following statements contained in the memorandum decision of the trial court:

"(1) That the testimony heard before the examiner was not limited either to (a) the allegations in the present claim or application, as to the nature of the aggravation, viz, 'severe pain between the shoulders, running into right shoulder and down right arm with right arm numb,' or (b) aggravation, if any, since the date of the denial of the plaintiff's first claim for aggravation [July 28, 1943]; and

"(2) That there is herein neither any definite nor substantial evidence that the aggravation, if any, occurred subsequent to the denial of said first claim of aggravation. Indeed, counsel for the plaintiff, in the examination of his

witnesses at the hearing before the examiner did not refer in any manner to said first claim nor its denial, but directed his query as to aggravation, if any, since July 22, 1941, or date of approval of report of arbitration commission. And Dr. Rickards in his testimony before such examiner did not refer to the condition of the plaintiff at the time either of the filing of the first claim of aggravation or the denial of such petition;

"(3) That the claimant was not examined by Dr. Rickards from the time the original claim for compensation was closed in July, 1941, until August 15, 1944; that there is no evidence of the nature of the examination made by him on August 15, 1944, nor of any objective findings then made by him, except that there then seemed to be more 'stiffness' of the right shoulder and back, and there is no evidence of any objective findings relative to 'impingement of nerves supplying the right leg or the origin or duration of such impingement.' . . .

"Inasmuch as the claimant in the present application stated the aggravation in his condition to be 'severe pain between shoulders, running into right shoulder and down right arm, with right arm numb,' it would seem that such claim, in view of the finding of the arbitration board, presented no issue for trial or hearing before the examiner for the joint board."

■ We have consistently held that a claim for aggravation cannot be sustained where it is based upon subjective symptoms alone. See *Stevich v. Department of Labor & Industries,* 182 Wash. 401, 47 P. (2d) 32; *Cooper v. Department of Labor & Industries,* 20 Wn. (2d) 429, 147 P. (2d) 522; *Kralevich v. Department of Labor & Industries,* 23 Wn. (2d) 640, 161 P. (2d) 661. Other cases might be cited, but those above mentioned sufficiently discuss the rule under consideration.

■ In addition to our conclusion that there was no substantial evidence of any aggravation of appellant's disability resulting from the original injury, shown to have occurred between July 28, 1943, and September 5, 1944, we are of the opinion that, as to the claim for aggravation to the members set out in his petition for rehearing, the order of the joint board of July 22, 1941, unappealed from, became *res adjudicata.*

We stated in *LeBire v. Department of Labor & Industries,* 14 Wn. (2d) 407, 128 P. (2d) 308:

"It is now the settled rule in this state that an order or judgment of the department resting upon a finding, or findings, of fact becomes a complete and final adjudication, binding upon both the department and the claimant unless such action of the department is set aside upon appeal or is vacated for fraud or something of like nature. [Citing cases.]"

The granting of the application for rehearing before the joint board did not reopen the entire matter and constitute a waiver of any plea of *res adjudicata* which might be based upon the order of July 22, 1941, or the order of the supervisor of July 28, 1943, for in *Nagel v. Department of Labor & Industries,* 189 Wash. 631, 66 P. (2d) 318, we stated:

"The trial court made a finding to the effect that, in granting respondent's application for a rehearing, filed during the month of December, 1933, the department reopened the entire matter, and 'thereby waived any plea of *res judicata,* if any such plea it ever had.' The law is not susceptible of such a construction. The department was merely proceeding in an orderly way to determine facts which were necessary to enable it to enter a proper order protecting the rights of all concerned."

The opinion further states:

"After the reopening of the claim, the legal effect of the hearing was limited strictly to the matter of aggravation. That the evidence took a wide range, is immaterial. This could not enlarge the lawful scope of the proceeding as it then stood. We agree with the joint board that the evidence affords no ground for holding that respondent is entitled to any relief upon this phase of the case, and we accordingly hold that the trial court erred in reversing the ruling of the joint board and directing that respondent be classified as totally and permanently disabled and entitled to receive departmental relief on that basis."

We are of the opinion that, by its order of July 22, 1941, the joint board determined that the condition claimed to exist in appellant's right shoulder and right arm did not

result from and was not connected with the original injury, and that such order became *res adjudicata.*

We are also of the opinion that the order of the supervisor made on July 28, 1943, rejecting the claim for aggravation, had the same effect. See *Royse v. Department of Labor & Industries,* 193 Wash. 488, 76 P. (2d) 318, wherein we stated:

"The order of the supervisor became *res adjudicata* upon the expiration of sixty days from the date on which the order rejecting the claim was communicated to the applicant."

■ There is one other question to which we desire to refer. It is apparently contended that, regardless of the fact that the application for rehearing did not refer to or mention any claimed aggravation to the right hip or right leg, there was testimony showing that there was aggravation of the claimed disability in the right hip and right leg.

Rem. Rev. Stat., § 7697 [P.P.C. § 704-1], provides what an application for rehearing before the joint board must contain:

"Such application shall set forth in full detail the grounds upon which the applicant considers such order, decision or award is unjust or unlawful, and *shall* include every issue to be considered by the joint board, and it *must* contain a detailed statement of facts upon which such claimant, employer or other person relies in support thereof." (Italics ours.)

We have heretofore set out the basis for claimed aggravation contained in the application for rehearing before the joint board, and such application makes no reference to any claimed aggravation to the right hip or leg. However, in answer to the question:

"Doctor, what was your opinion, on August 15, 1944, when you examined him, with reference to whether or not there had been any aggravation since you last saw him in July—I mean, in 1941,"

Dr. Rickards stated:

"A. His complaint of his hip and leg, that had not shown up previously, not to the condition it is in at the present

time. . . . Q. What was your opinion, doctor, as to whether or not there was any aggravation between the closing in '41 and the time he applied for reopening? A. No doubt there was an aggravation there of the hip."

We think there are three reasons why any claimed aggravation to the right hip and leg could not be, and was not, considered by the joint board: (1) The application for rehearing made no mention of any claimed aggravation to the right hip or leg; (2) there had never been a prior determination by the department of any disability to the right hip or leg, resulting from the original injury; and (3) the hearing before the joint board was limited strictly to the matter of aggravation, regardless of the fact that the evidence took a wide range. See *Nagel v. Department of Labor & Industries*, 189 Wash. 631, 66 P. (2d) 318, heretofore cited and quoted from.

For the reasons herein assigned, we are of the opinion the trial court did not err in granting the judgment notwithstanding the verdict, and the judgment of the trial court is therefore affirmed.

MILLARD, C. J., ROBINSON, SIMPSON, and SCHWELLENBACH, JJ., concur.